

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Stalking and Antiharassment Protection Order for: | ) ) ) ) | No. 41080-3-III |
| J.O.G. | ) ) ) ) | UNPUBLISHED OPINION |

COONEY, J. — Amanda Magee appeals a stalking and antiharassment protection order that restrains her from contacting J.O.G., among other restrictions. Ms. Magee claims substantial evidence does not support the trial court's findings of stalking and unlawful harassment, and the court erred in awarding J.O.G. attorney fees and costs. We disagree with Ms. Magee's arguments, affirm the court's issuance of the protection order, and award J.O.G. attorney fees on appeal.

BACKGROUND

In 2018, J.O.G. was 16 years old and a student at Bellevue Christian High School. Ms. Magee, who was in her 30s at the time, had a child enrolled at the school and was a

volunteer assistant director in the theatre program.  Ms. Magee and J.O.G. developed a friendship during Ms. Magee's tenure as a volunteer.  The two communicated through text messages, and Ms. Magee would often drive J.O.G. home from after school programs.

When J.O.G. was a junior in high school, J.O.G. and his family traveled from Washington to California to attend the Rose Bowl.  Ms. Magee followed and stayed at the same hotel as J.O.G. and his family.  During the stay, Ms. Magee invited J.O.G. to her room so he could change into his swimming suit before going to the hotel swimming pool.  J.O.G. claimed that Ms. Magee made sexual advances toward him and "grop[ed] his penis while he was clothed."  Clerk's Papers (CP) at 77.

In March 2019, J.O.G.'s mother petitioned for, and was granted, an antiharassment protection order that restrained Ms. Magee from contacting J.O.G.  Ms. Magee was later charged with communication with a minor for immoral purposes and two counts of violating the protection order.  The protection order expired on November 13, 2022.

On November 15, 2024, J.O.G. filed a petition for a stalking protection order against Ms. Magee after she unexpectedly appeared at his apartment in Pullman, Washington three days prior.  On January 17, 2025, J.O.G. amended his petition, alleging Ms. Magee had also engaged in unlawful harassment.  In support of his petition, J.O.G. asserted that Ms. Magee "throughout the span of several years has demonstrated a course of conduct intended to intimidate, frighten, disrupt, alarm, annoy and harass [him]."  CP

at 75.  J.O.G. stated the conversations between him and Ms. Magee when he was a minor were "unquestionably inappropriate and made in an effort to groom [him]."  CP at 76. J.O.G. attached copies of the text messages he exchanged with Ms. Magee while he was a minor.  J.O.G. claimed, "Mrs. Magee would often drive [him] home from after school programs and talk to [him] late into the night and early morning hours," and asked if she could "suck [his] fingers, which [he] allowed her to do," not understanding "the sexual nature of the request."  CP at 134.

J.O.G. alleged Ms. Magee stayed at a hotel directly across the street from his residence and befriended his roommate in November 2024.  On November 12, 2024, Ms. Magee "showed up" at J.O.G.'s residence, requesting to leave a gift for his roommate. CP at 134.  J.O.G. directed Ms. Magee to leave.  Ms. Magee wanted to talk with J.O.G., and claimed J.O.G. loved her, wanted to have sex with her, and the two had been communicating "telepathically" and "through encoded Instagram messages."  CP at 135. J.O.G.'s roommates removed Ms. Magee from the residence.

A hearing was held on J.O.G.'s petition on February 12, 2025.  J.O.G.'s roommate testified at the hearing that he met Ms. Magee on October 28, 2024.  In November 2024, Ms. Magee sent the roommate a text message stating she was in Pullman and needed a place to "crash" because "she was unable to get any hotels."  Tr. of Proc. Ord. Hr'g (TPO) at 66-67.  The roommate knew Ms. Magee and J.O.G. "had a falling out" but was unaware of "the severity of what that was until that day."  TPO at 67.  The roommate

testified that J.O.G. "had an immediate look of confusion, which very quickly became a look of shock" when he saw Ms. Magee. TPO at 68.

The roommate testified that he was introduced to Ms. Magee by "Nakeel." TPO at 69-70. He stated that Ms. Magee did not "seek" him out but they met when "Nakeel was picking [him] up" to go to a "club meeting," and Ms. Magee was "tagging along with [Nakeel]." TPO at 70. The roommate futher testified that Ms. Magee learned he and J.O.G. were roommates before the November 12 incident and had not spoken with J.O.G. about his friendship with Ms. Magee at Ms. Magee's request. When Ms. Magee arrived at J.O.G.'s apartment on November 12, the roommate asked her to leave "easily 50 times, maybe." TPO at 78. He claimed Ms. Magee departed the residence after "all three of us had continuously asked her to." TPO at 76.

J.O.G. testified he did not expect Ms. Magee to be at his apartment on November 12, 2024, and he was "[t]errified, shocked," and scared because she knew where he lived. TPO at 82. J.O.G. stated that he told Ms. Magee to leave his residence, and she responded by asking if they could just talk and made "claims that [J.O.G.] love[d] her, [J.O.G.] asked her for sex, [J.O.G.] had been telepathically communicating with her, and [had been] communicating with her through encoded Instagram messages." CP at 223. J.O.G. has since increased his therapy appointments, purchased bear spray, and now frequently checks "to make sure that [Ms. Magee]'s not following [him]" after her unexpected appearance at his residence. TPO at 83. J.O.G. testified he felt harassed

4

when he saw Ms. Magee and that the contact caused him extreme emotional distress. On

cross-examination, J.O.G. acknowledged the November 12 meeting was the only contact

he and Ms. Magee had over the previous six years.

Ms. Magee testified that she had "no idea" the roommate lived with J.O.G. when

she was introduced to him. TPO at 100. Ms. Magee claimed she learned the two were

roommates "within days before" the incident on November 12. TPO at 101. Ms. Magee

testified she was in Pullman for her cat's cancer treatments at Washington State

University and presented copies of e-mails she had sent to the university.

The court granted J.O.G.'s petition for a stalking and antiharassment protection

order at the conclusion of the hearing, finding that Ms. Magee subjected J.O.G. to both

stalking and unlawful harassment. The court also awarded J.O.G. his attorney fees and

costs.

Ms. Magee timely appeals.

ANALYSIS

Ms. Magee argues substantial evidence does not support the trial court's finding of

stalking and unlawful harassment. We disagree.

"[W]e generally review a superior court's decision to grant or deny a protection

order for an abuse of discretion." *Jones ex. rel. C.J. v. Darragh*, 34 Wn. App. 2d 965,

968, 572 P.3d 1247 (2025). A court abuses its discretion when its decision is based on

untenable grounds or untenable reasons. *Rodriguez v. Zavala*, 188 Wn.2d 586, 598, 398

P.3d 1071 (2017).  A decision rests on untenable reasons if it is based on an incorrect

legal standard.  *Id.*

We review the trial court's factual findings for substantial evidence.  *In re*

*Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007).  Substantial

evidence exists to support a finding of fact if the record contains sufficient evidence to

persuade a fair-minded, rational person of the truth of the determination.  *Bering v.*

*SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986).  When doing so, we view the

evidence and all reasonable inferences in the light most favorable to the respondent.  *In re*

*Marriage of Zigler*, 154 Wn. App. 803, 812, 226 P.3d 202 (2010).  We do not reweigh

evidence or determine credibility.  *Id*.  We defer to the trial court's decisions on the

weight of the evidence, credibility of the witnesses, and conflicting evidence.  *Snyder v.*

*Haynes*, 152 Wn. App. 774, 779, 217 P.3d 787 (2009).  Unchallenged findings of fact are

verities on appeal.  *In re Marriage of Rounds*, 4 Wn. App. 2d 801, 804, 423 P.3d 895

(2018).

"Stalking" is defined as:

> (c) Any *course of conduct* involving repeated or continuing contacts, attempts to contact, monitoring, tracking, surveillance, keeping under observation, disrupting activities in a harassing manner, or following of another person that:
>
> (i) Would cause a reasonable person to feel intimidated, frightened, under duress, significantly disrupted, or threatened and that actually causes such a feeling;
>
> (ii) Serves no lawful purpose; and

(iii) The respondent knows, or reasonably should know, threatens, frightens, or intimidates the person, even if the respondent did not intend to intimidate, frighten, or threaten the person.

RCW 7.105.010(35) (emphasis added). "Unlawful harassment" is defined as:

A knowing and willful *course of conduct* directed at a specific person that seriously alarms, annoys, harasses, or is detrimental to such person, and that serves no legitimate or lawful purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner.

RCW 7.105.010(37)(a) (emphasis added). A "[c]ourse of conduct" is a "pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 7.105.010(7)(a). A course of conduct includes "any form of communication, contact, or conduct," including by means of electronic communication. *Id.*

Ms. Magee argues the court erred in granting the stalking and antiharassment protection order because the brief, singular contact she had with J.O.G. on November 12 does not amount to a course of conduct. We disagree. In finding Ms. Magee had engaged in a course of conduct, the trial court properly considered the entirety of the history between the parties. Substantial evidence supports the trial court's finding of both stalking and unlawful harassment.

Ms. Magee had been previously restrained from contacting J.O.G. In support of the first protection order, J.O.G. claimed that Ms. Magee inappropriately communicated

with him when he was a minor, "groomed" him, followed his family during a vacation, made sexual advances toward him, "groped" his penis, and sent him countless text messages. CP at 10. Ms. Magee was charged twice with violating the protection order and of communicating with a minor for immoral purposes.

Regarding the November 12 incident, Ms. Magee was aware that J.O.G. resided with the roommate before arriving at their shared residence. Ms. Magee had described her falling out with J.O.G. to the roommate and asked him to not reveal their friendship to J.O.G. After arriving at J.O.G.'s residence, Ms. Magee declined numerous requests to leave and departed only after being ushered out. Further, Ms. Magee informed J.O.G. that she had been messaging him on Instagram.

While Ms. Magee and J.O.G. did not have any contact during the previous six years, Ms. Magee has a history of unwanted contact and communication with J.O.G. that served no legitimate or lawful purpose.[1] The November 12 contact was simply the most recent in series of acts that commenced more than six years earlier. Therefore, substantial evidence supports the trial court's findings that Ms. Magee engaged in a course of conduct for purposes of RCW 7.105.010(35) and (37)(a).

---

[1] The six-year gap in contact between Ms. Magee and J.O.G. does account for any contact that may have occurred resulting in Ms. Magee's two charges of violation of a protection order that were adjudicated on May 5, 2021.

Ms. Magee next argues the court erroneously awarded J.O.G. attorney fees and costs because there was no basis for issuing the protection order. J.O.G. responds that the court properly awarded him attorney fees and costs under RCW 7.105.310(1)(j) because he proved by a preponderance of the evidence that he was stalked and unlawfully harassed by Ms. Magee. We agree with J.O.G.

In issuing a protection order, the trial court has broad discretion to grant relief, including requiring the respondent to reimburse the petitioner for costs incurred and reasonable attorney fees. RCW 7.105.310(1)(j). Because the trial court properly entered the protection order against Ms. Magee, it was also within its discretion to award J.O.G. attorney fees and costs.

J.O.G. requests attorney fees on appeal pursuant to RAP 18.1 and RCW 7.105.310(1)(j). RAP 18.1 provides that a party may request attorney fees on appeal if applicable law grants them that right. Moreover, a prevailing party on appeal may recover fees if fees were permitted at the trial court level. *In re Domestic Violence Prot. Ord. for Timaeus*, 34 Wn. App. 2d 670, 685, 574 P.3d 127 (2025).

RCW 7.105.310(1)(j) grants the court discretion to award costs incurred and reasonable attorney fees to a petitioner of a protection order. Because J.O.G. is the prevailing party on appeal and an award of attorney fees is statutorily authorized, we grant J.O.G.'s request for attorney fees and costs incurred for this appeal.

9

No. 41080-3-III
*In re the Stalking Prot. Order for J.O.G.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Staab, C.J.

_____
Hill, J.